**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John DIOGUARDI, a/k/a Johnny Dio,
Thomas Plumeri, David Perlman and
First National Kosher Provisions, Inc.,
Defendants-Appellants.**

No. 171, Docket 32043.

United States Court of Appeals,
Second Circuit.

Argued April 21, 1970.

Decided May 27, 1970.
Certiorari Denied Oct. 12, 1970.
See 91 S.Ct. 50, 51.

**1034**

Otto G. Obermaier, Special Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Jay S. Horowitz and Paul B. Galvani, Asst. U. S. Attys., of counsel), for plaintiff-appellee.

Jerome J. Londin (Joseph E. Brill, New York City, of counsel), for defendants-appellants Dioguardi, Plumeri and First National Kosher Provisions, Inc.

Jacques M. Schiffer, Rockville Centre, N.Y., for defendant-appellant Perlman (John L. Pollock, New York City, on the brief).

Before MOORE, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

Defendants were charged with the substantive crimes of fraudulently transferring and concealing the property of a bankrupt in contemplation of bankruptcy, and of fraudulently concealing the bankrupt's assets from the trustee in bankruptcy in violation of 18 U.S.C. § 152, and a conspiracy to do the same, 18 U.S.C. § 371. In 1967, after an 18 day jury trial in the District Court for the Southern District of New York, they were convicted on all three counts. We affirm.[1]

I.

The bankrupt, Consumers Kosher Provisions, Inc. (Consumers), was under the effective control of defendant John Dioguardi. Defendant David Perlman had the title of president and defendant Thomas Plumeri was an important employee. In the summer of 1964, while Consumers was experiencing serious financial difficulties, Dioguardi negotiated a contract with American Kosher Provisions, Inc. (American), a successful competitor. The contract, dated August

---

1. The two and a half year lapse since conviction was due in large part to the necessity for remanding the case, in March 1968, at the request of the Government, for a hearing with respect to electronic surveillance. The district court held proceedings in abeyance pending the Supreme Court's decision in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). It then found, after hearing, that the convictions were not affected by a single unrelated instance of electronic surveillance of appellant Dioguardi. We find no fault with this determination.

15, 1964, provided that American would purchase all Consumers' stock, represented to be 72½ shares; assume its obligations, including five-year employment contracts with Dioguardi and Perlman; and take over operations pending the closing, which was to be not later than October 27. When the parties met that day, Consumers' attorney, J. Jack Brown, failed to produce a certificate for the 27½ shares owned by the estate of Herman Rose, whose executrix had signed the contract; Brown claimed he had not had sufficient time to qualify her. It also turned out that, in addition to the 72½ shares specified in the contract, there were another 27½, owned by Morris Meat Market, Inc. Brown suggested that since all the officers, directors and stockholders of Morris were present, the shares could be transferred at that time although Morris' financial records indicated this might render it insolvent.

American's counsel naturally refused to permit his client to close. Two officers of American, Alpert and Krutchik, said that creditors of Consumers had been holding off pending the closing; that under the circumstances they would not consent to an extension; and that the following morning the creditors would be notified the deal was off. Alpert instructed Krutchik to take an inventory, with a representative of Consumers, and return the Consumers property located at its own plants. After complications unnecessary to detail, in which all three defendants were involved, the inventory was completed in the early morning hours of October 29, and defendant Plumeri gave a receipt for the goods. Later, American inventoried and returned the Consumers property that had been at American's plant; receipt of this property was also acknowledged by Consumers. According to American's recapitulation, the total property returned amounted to $32,452.57, valued at cost: Raw meat, finished and semi-finished products accounted for $10,071.54, and supplies, such as spices, casings, boxes and other containers, made up the balance.

Toward the conclusion of the inventory taken on October 29, Dioguardi told American's general manager that he was going into business under the name of First National Kosher Provisions, Inc. (First National), a hitherto inactive corporation he controlled. Operations were conducted in Consumers' plant and with its leased trucks. New books were opened and First National's name was substituted on Consumers' invoices and sales tickets. To obtain working capital, defendant John Dioguardi, along with defendant Perlman and attorney Brown, obtained from one Sol Lichter a $10,000 check to Dominick Dioguardi, payment of which John Dioguardi guaranteed. No note was given or time of payment specified, and the loan had not been repaid at the time of trial. This check and an additional $10,000 provided by John Dioguardi were used to open a First National account at the Central State Bank; Plumeri, Perlman and Dominick Dioguardi were listed as the corporate officers.

First National began business by utilizing Consumers' inventory; it had no other. The Government's evidence was that the entire Consumers inventory was so utilized. Haberman, an accountant engaged by Dioguardi, called him and reported that First National's profit figures for November were "unduly" high; Dioguardi promised an answer. At a meeting with Haberman shortly thereafter, Dioguardi and Plumeri produced an invoice purporting to represent the total pounds of Consumers' meat that First National had used. The figure $5523, although well below actual cost, was then assigned as the value of the meat and Haberman said he would carry this as a liability to Consumers. His workpapers so showed it, but it was not carried into First National's financial statements. Later Dioguardi remarked to Haberman that the $5523 would be paid to Consumers when First National received a bill. It never did.

On January 25, 1965, three creditors filed a petition in bankruptcy against Consumers. It was later adjudicated a

bankrupt and, on March 2, 1965, Herman Sommers was appointed trustee. In the interval defendants moved First National from Blake Ave., Brooklyn, to East 180th Street in the Bronx, taking some of Consumers' equipment and fixtures with them. These were ultimately discovered by the trustee and, together with the fixtures and equipment left at Blake Ave., realized $3500. Consumers' estate, with debts of over $265,000, had no other assets.

■ Although much dust was scattered over details concerning the amount and value of the inventory that was used, the theory of defense was that attorney Brown had sanctioned the use of Consumers' inventory and plant as a means of attempting to salvage something for Consumers' creditors, although the latter were never advised of defendants' intentions. Brown, whose testimony was replete with inconsistencies, supported this to some degree. Plumeri was the only defendant to testify. Despite or perhaps partially because of this and other testimony adduced by the defense, it is apparent, without burdening this opinion with more detail, that the jury was abundantly justified in rejecting defendants' version and accepting the Government's theory that defendants deliberately aborted the closing with American and then helped themselves to Consumers' property. Appellants' contention of insufficient evidence thus borders on the frivolous, and we turn to claims of trial error.

## II.

■ Alpert, of American, was the first Government witness. During the luncheon recess, the prosecutors mentioned to him in the corridor that he had omitted to testify to several facts he had previously disclosed. On recross examination that afternoon he denied having talked with the prosecutors during the recess, other perhaps than to ask when he could return to Miami. At the conclusion of redirect examination the prose-

cutors requested a conference at sidebar and revealed the conversation. The judge asked defense counsel whether they wished to bring this out and proposed as alternatives a statement by the prosecutors or further examination of Alpert. Counsel insisted on a hearing outside the presence of the jury, which the judge denied. The prosecutor said he would not object if defense counsel wished to ask Alpert whether it wasn't a fact that he had spoken to the prosecutors in the corridor. The judge urged defense counsel to cooperate "to the extent of advising whether you wish that revealed to the jury or whether you think your clients would be in any way prejudiced by revealing it to the jury." When counsel declined, the court directed the prosecutors to tell the jury what had occurred.

The leading prosecutor then stated to the jury that, contrary to Alpert's testimony, he had told Alpert during the recess that he thought the latter "had purposefully omitted important testimony, damaging against the defendants, and that he sounded on cross-examination more like Mr. Brill's witness than the government's witness." He added that his associate had remarked about Alpert's failure to mention an offer by American to close if the sellers would furnish a surety bond for protection; the associate went into greater detail about this.[2] The judge then asked Alpert whether the prosecutors' statements were true. Alpert answered he "would imagine it is substantially about what they may have said." Defendants' motion for a mistrial was denied and, after a few further questions by defense counsel, Alpert was excused.

We have some difficulty in understanding just what is claimed to have been wrong about this. The court could not leave the record with a lie by Alpert known to the prosecutors but not disclosed to the jury, unless defendants preferred to waive the point—which they were given an opportunity to do. If the criticism is that the prosecutors

---

2. The prosecution had already developed this in Alpert's redirect examination.

got before the jury not only Alpert's false answers but their belief that he had failed to give other damaging testimony, this was defense counsel's own doing; the prosecutor had offered to let them expose the prevarication *simpliciter*. Moreover, if the episode was to be brought out, as defense counsel had forced it to be, the prosecution was entitled under the principle of completeness, see 7 Wigmore, Evidence §§ 2094, 2097 (3d ed. 1940), to bring out the whole conversation, at least in the absence of serious prejudice to the defendants, so as to rebut, for example, any inference that the prosecutors had urged Alpert to lie. We likewise fail to see why, on what he had before him, the judge was compelled to order a hearing outside the presence of the jury. The purpose of such a hearing would have been to assist defense counsel in making an informed tactical choice. But the judge was convinced, properly as matters turned out, that they had already heard all there was. The case would stand differently if the prosecutor had taken advantage of the situation by placing before the jury inculpatory material not disclosed at sidebar and not otherwise in evidence.

### III.

A more serious point is the Government's failure to produce the program by which its witness Row had instructed a computer to prepare figures showing the dates when First National had exhausted the various items of Consumers' inventory turned over by American.

A previous witness, Lonergan, had calculated First National's purchases of raw materials and sales of finished products during the period from October 29 to November 26, 1964, and its inventory of both on November 27. He determined the sales to have amounted to 105,648 pounds and the inventory to 42,679 pounds, a total of 148,327 pounds. Purchases had been 108,475½ pounds. Deduction of these left 39,851½ pounds that must have come from some other source,

presumably Consumers' inventory, although this appeared to have been only 25,569½ pounds. Defendants had criticized Lonergan's data and computations on numerous grounds.

Row used as input data this figure of Consumers' inventory and Lonergan's tabulations of various slips showing First National's purchases of raw materials and sales of finished products. The computer was then instructed to determine the dates when, on the basis of first in, first out, Consumers' inventory would have been exhausted both for specific items and in gross; the answer to the latter was November 5. When the Government offered print-outs showing the computer's answers, defendants were granted an extensive *voir dire*.

The defense began by bringing out that Row had made no independent examination but had relied on Lonergan's work. Criticisms previously made with respect to that testimony were repeated, and it was contended that Row had ignored some of Lonergan's data. Mr. Schiffer, counsel for Perlman, moved to strike Row's testimony and to exclude his exhibits on these grounds. The motion was denied. Mr. Brill, representing the other defendants, then raised the contention that the program given the computer was producible under the Jencks Act, 18 U.S.C. § 3500. The judge did not agree. Mr. Brill next went into more questions to bring out again that Row had not participated in the preparation of the underlying documents, and that the computation had been made on the principle of first in, first out. The prosecutor developed that in order to assure the accuracy of the computer's work, "a test deck was created which would be a sampling of the information we have in this case, the tabulating cards, and they were run through the computer using the program, and then this was manually verified to make sure that the computer had come out with the right answers." After all this, court was adjourned at Mr. Brill's request to enable him to make motions the next morning.

When the court met, this time outside the presence of the jury, Mr. Brill referred to a motion of the previous day "with respect to the 3500 material," which he indeed had made, and "a motion upon the failure of the government to supply the programming material on the basis of which Mr. Row's testimony was given," which had not been made except insofar as he and Mr. Schiffer had raised the point of alleged absence of certain needed data. In answer to a question from the court concerning § 3500, he went into an extensive argument on that score. Nothing more was said regarding the defense's right to the program quite apart from the Jencks Act. The judge denied the motions. Mr. Brill then asked that the program be marked as a court exhibit, as is commonly done with material held to be non-producible under the Jencks Act. The prosecutor denied having or having had it. Mr. Brill moved that the prosecutor be directed to obtain it; the court declined. Then, after having moved to strike the testimony and exhibits of Lichter and of the representative of the Central State Bank, some testimony of Alpert and much of the testimony of Sommers, Mr. Brill moved to strike Row's testimony and the print-outs on the ground "that this testimony is based upon the hearsay evidence of a mechanical or an electronic computer which was not itself subject to cross-examination, thereby denying the defendants the constitutional right of confrontation and cross-examination * * *." The court denied this. Motions to strike the testimony and exhibits of Lonergan and Krutchik were also denied.

■ We fully agree that the defendants were entitled to know what operations the computer had been instructed to perform and to have the precise instruction that had been given. It is quite incomprehensible that the prosecution should tender a witness to state the results of a computer's operations without having the program available for defense scrutiny and use on cross-examination if desired. We place the Government on the clearest possible notice of its obligation to do this and also of the great desirability of making the program and other materials needed for cross-examination of computer witnesses, such as flow-charts used in the preparation of programs, available to the defense a reasonable time before trial. See United States v. Kelly, 420 F.2d 26 (2 Cir. 1969). However, we do not believe the interests of justice require reversal of these convictions because of what occurred here.

■ To begin, we have the gravest doubt whether defense counsel made intelligible to the court what we deem their one meritorious point concerning the program, a point first clearly expressed in the reply brief in this court, namely "that without the 'program' it [the defense] could not properly test the validity of the results of the computer nor could it properly cross-examine Mr. Row." Although close scrutiny of the record we have summarized in what must have seemed tedious detail may enable one, reading with the benefit of hindsight, to glean the argument that the defense was entitled to check just what the computer had been asked to do, any suggestion of this was buried in the avalanche of other arguments, especially the claim with respect to § 3500. That claim was wholly without merit, as mere reading of the statute, let alone consideration of its purpose explicated in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), plainly shows. Despite frequent judicial reminders, counsel cannot seem to understand that rather than being the Magna Carta of the right to production, the Jencks Act is a restriction on it in certain respects. It would thus be unfair to the trial judge and a waste of the time of another judge and jury for us to direct a new trial for failure to compel production of the program unless there is an appreciable risk that prejudice resulted. We do not believe there is, for a number of reasons.

The instruction here given the computer must have been one of utmost simplicity, as defense counsel must have realized—to start with the opening inven-

tory, sum up the purchases and sales for each day, subtract the latter from the opening inventory, and repeat the process until the opening inventory was exhausted—in this case six times. Moreover, and more important, the data were so limited that defense counsel could easily have checked the correctness of the computer's performance by adding machine or even manually, as the Government had itself done in one instance.[3] To be sure, that would not be a sufficient answer if the trial had ended shortly after Row's testimony and there now appeared to be any real likelihood that the computer might have failed in its simple task. But neither of these contingencies exists. The trial lasted for another ten days; defense counsel thus had ample opportunity to check the computer's performance or, for that matter, to renew their demand for production of the program, or request a subpoena, in a more readily understandable way. Even now, two and a half years after the trial, we are pointed to no error in the computer's calculations. Finally, Row's testimony was a quite unnecessary frill. It was not really disputed that First National had made use of Consumers' inventory; the controversy was whether the individual defendants intended to pocket the profit or pay Consumers for what First National had used. The precise date when Consumers' inventory would have been exhausted on a first in, first out basis had only a peripheral bearing on that issue.

### IV.

 The only other contentions that warrant comment are a variety of claims that defendant Dioguardi was denied a

fair trial because of his known association with organized crime.

The judge acted well within his discretion in denying motions for a continuance or change of venue. Many of the articles referring to the case were in publications having limited or no circulation in the Southern District of New York. With respect to others, which referred to Dioguardi's connections with the Mafia, we echo Judge Weinfeld's observations in United States v. Kahaner, 204 F.Supp. 921, 924 (S.D.N.Y.1962), aff'd, 317 F.2d 459 (2 Cir.), cert. denied, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963), and our own in United States v. Grassia, 354 F.2d 27, 29 (2 Cir. 1965), rev'd on other grounds, 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034 (1968). We add the counsel of experience that transfer from a metropolitan area to a smaller city may result in more rather than less intensive publicity.

 Judge Mansfield's examination of the jurors, far from being subject to valid criticism, seems to have been a model which other trial judges could utilize to advantage in cases of this sort—save in one particular. In examining at sidebar prospective jurors who had read or heard anything about any of the defendants in the case, the judge did not arrange to have the defendants close by. See F.R.Cr.P. 43. However, they were seated only 15–20 feet away; their experienced counsel, who had been earlier advised of the proposed procedure, did not ask that they be allowed to come nearer;[4] most of the jurors thus questioned were excused by the court; ample time was given for counsel to consult with defendants concerning challenges;

---

3. This would have taken very little more time, if any, than it took the Government to use the computer. The key-punch operator had to punch a card for each slip, recording the item, quantity, date and whether it was a purchase or sale. The computer then processed this information in accordance with the program. Similarly, if an adding machine were used, only one entry per slip would have

been necessary. The only discernible difference is that manual sorting of the slips according to date, item, and type of transaction would have been required before the adding machine operator could begin. Given the limited number of entries, this difference is hardly significant.

4. When the point was first raised, at the hearing on sentences, the judge stated he would have granted such a request.

and all the jurors whom the court had not excused were challenged either by the defendants or the Government.

█ The remaining point is that the indictment, which was sent to the jury over objection, described Dioguardi as "a/k/a Johnny Dio," the name by which he was often described in articles about the underworld; that the prosecutors asked two witnesses whether they knew Dioguardi by another name; and that on one occasion the court inadvertently referred to him as Mr. Dio. While we see no occasion for the Government's having inserted the added phrase in the indictment or for the prosecutors' questions, since the witnesses all knew Dioguardi under his full name as well, see United States v. Monroe, 164 F.2d 471, 476–477 (2 Cir. 1947), cert. denied, 333 U.S. 828, 68 S.Ct. 452, 92 L.Ed. 1113 (1948); United States v. Grayson, 166 F.2d 863, 867 (2 Cir. 1948); contrast United States v. Miller, 381 F.2d 529, 536 (2 Cir. 1967), cert. denied, 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968); United States v. Valenti, 74 F.Supp. 718 (W.D.Pa.1947); United States v. Melekh, 193 F.Supp. 586, 595 (N.D.Ill.1961), the defense itself had caused the Dio name to be brought before the jurors as a result of its claims with respect to pre-trial publicity. Moreover an abbreviation, unlike a true alias, does not "arouse suspicion that the accused is a person who has found it useful or necessary to conceal his identity." United States v. Grayson, *supra*, 166 F.2d at 867. It is thus even clearer than in *Grayson* that "the references complained of would not in our judgment even remotely tend to justify a reversal."

Affirmed.

J. JOSEPH SMITH, Circuit Judge (concurring).

Were this case at all close on the issue of whether First National used the bankrupt's assets with no intention of paying for them, I would be inclined to dissent on the ground that the computer program should have been produced in spite of the erroneous reliance on section 3500 in the request for it. But I agree that there was no real dispute on the issue of the use which was affected by the accuracy of the computer, and concur in the affirmance of the judgment.