PEARL BREWING CO. et al., Plaintiffs,

v.

JOS. SCHLITZ BREWING CO.
Defendant.

Civ. A. No. 71–H–778A.

United States District Court,
S. D. Texas,
Houston Division.

May 3, 1976.

John C. Snodgrass and Max Hendrix, Vinson, Elkins, Searls, Connally & Smith, Houston, Tex., for plaintiffs.

Frank Knapp and Fletcher Etheridge, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for defendant.

CARL O. BUE, Jr., District Judge.

## MEMORANDUM AND ORDER

### I. INTRODUCTION

Several motions are pending before the Court in this complex antitrust litigation which involves alleged anti-competitive conduct among certain manufacturers, distributors, wholesalers and retailers in the beer industry in Texas. Plaintiffs' Motion for Leave to File Second Amended Complaint is granted in part and denied in part; Defendant's Motion to Amend Counterclaim is granted, and the Clerk is directed to file the Amended Counterclaim; Plaintiffs' Motion to Strike Affirmative Defenses, which raises the issue of the propriety of invoking in an antitrust context the equitable defenses of *in pari delicto* and "unclean hands", is granted; Plaintiffs' Motion to Sever Defendant's Counterclaim for Separate Trial is granted; Defendant's Motion to Compel Discovery, which raises the issue of the proper scope of "non-trial" experts pursu-

ant to Fed.R.Civ.P. 26(b)(4)(B), is granted in part and denied in part.

## II. LEAVE TO AMEND COMPLAINT

### A.

Plaintiffs' Motion for Leave to File Second Amended Complaint is granted in part and denied in part. This complaint adds a new cause of action, attempts to relate back some of the allegedly monopolistic conduct of defendant to a period at least four years prior to the filing of the original complaint, if not before, and specifies particular dollar amounts which are purported to be actual damages suffered by each plaintiff under each appropriate cause of action.

### B.

Defendant objects to the motion to amend for a variety of reasons:

(1) claims and damages caused by alleging a "narrowing of the gap" are barred in part by limitations;

(2) actions pleaded for attempted monopolization fail to state a claim upon which relief can be granted;

(3) plaintiffs' claims do not operate under the law to permit relating back more than four years before the filing of the original complaint; and

(4) the pleading of "fraudulent concealment" is not adequately pleaded so as to permit a tolling of the applicable limitations period.

### C.

The matters raised by the parties regarding the propriety of plaintiffs amending their complaint relate to factual questions vigorously contested by the parties. These matters typically cannot be resolved on the pleadings and, in any event, are improperly inquired into at this stage, especially in view of the liberal rules regarding amendment of complaints. Fed.R. Civ.P. 15.

Thus, the Court now permits an amendment to reflect the addition of technical details, such as party names and particular dollar amounts, and the addition of the claims contained in Sections VII and X of the proposed amendment, which are arguably related to matters previously plead. All remaining allegations and defenses raised by the parties are fundamentally composed of factual matters still in dispute, such as defendant's statute of limitations defense and plaintiffs' allegations of conduct meriting inclusion of pre-July 15, 1967, claims. The verity of facts upon which these matters are based cannot be resolved at this time. Therefore, the complaint may be amended only to reflect actions alleged to have occurred on or after July 15, 1967, the date marking the fourth year before the filing of the original complaint, and to reflect a cause of action suggesting "narrowing the gap", a practice so closely connected to the concept of pricing as to be raised, arguably, in plaintiffs' previous two complaints.

### D.

Subsequent proof by the parties may demonstrate to the Court the need to restrict or expand the scope of this litigation prior to trial based upon the development of the above factual areas. For present purposes of discovery and on the present record, the Court concludes at this time that the amendment is proper insofar as events after July 15, 1967, are alleged to have occurred. The Court does not view such amendment as altering the basic evidentiary framework of the case heretofore existent or causing undue delay in the conclusion of discovery or the start of trial. Plaintiffs will additionally be allowed to amend to substitute the estate of one of the original parties who has died. Defendant will be allowed 45 days in which to answer.

## III. MOTION TO AMEND COUNTERCLAIM

Defendant's Motion to Amend Counterclaim is granted. The Clerk is hereby directed to file defendant's Second Amended Counterclaim, although for purposes of uniformity, defendant may wish to incorporate in one pleading its amended counterclaim and its answer to plaintiffs' amended com-

plaint. Defendant asserts correctly that this amendment eliminates three counts from the original counterclaim. As represented to the Court at an in-chambers conference, plaintiffs do not really object to the amendment, but rather to any trial of the counterclaim simultaneously with the trial of plaintiffs' case-in-chief. The merits of separate trials are discussed hereafter. See Part V, *infra*. The amendment to the counterclaim will be granted.

## IV. MOTION TO STRIKE AFFIRMATIVE DEFENSES

### A. Introduction

■ Plaintiffs' Motion to Strike Affirmative Defenses is granted. Plaintiffs' motion challenges defendant's right to invoke the equitable defenses of *in pari delicto* and "unclean hands". The judicial starting point for evaluation of these defenses is *Kiefer-Stewart Co. v. Jos. E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

### B. Kiefer-Stewart and "Unclean Hands"

In *Kiefer-Stewart*, a wholesaler of liquor sued its supplier for antitrust violations. As a defense, the supplier introduced evidence designed to show that the wholesaler had agreed with other wholesalers to set minimum prices for the sale of liquor, and thus had agreed to violate the antitrust laws. 340 U.S. at 214, 71 S.Ct. at 261, 95 L.Ed. at 224. The trial court instructed the jury that, even if proved, the wholesaler's part in such a conspiracy was no defense to the cause of action brought by the wholesaler against the supplier. *Id.*

On appeal, the United States Supreme Court unanimously upheld the use of this instruction. The Court stated that any infraction of the antitrust laws by the plaintiff wholesaler could be remedied by the institution of appropriate proceedings against it by the Government or appropriate injured private persons. *Id.* However, such alleged illegal conduct could not, according to the Court, legalize the alleged

unlawful conduct of the defendant supplier or immunize it against liability. *Id.*

Other courts interpreting the *Kiefer-Stewart* decision have excluded the defense of "unclean hands" on the basis of that decision. *See, e. g., Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F.Supp. 780, 796 (S.D.Tex.1971), aff'd, 476 F.2d 989 (5th Cir. 1973); *cf. Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 981–82 (2d Cir. 1975).[1]

### C. Perma Life and In Pari Delicto

#### 1. Prior Judicial Pronouncements

There are significant similarities between the defenses *in pari delicto* and "unclean hands", especially since they are premised on the same rationale. *See* 2 Pomeroy, Equity Jurisprudence §§ 397–398 (5th ed. 1941). Indeed, it might properly be stated that within the general category of an antitrust plaintiff's conduct under the label "unclean hands" is included that category of conduct which is properly labeled *in pari delicto* to take cognizance of the equal fault of a plaintiff who participates in a scheme maintained by a defendant whom the plaintiff thereafter charges with anticompetitive conduct. Given these conceptual similarities, the "unclean hands" decision by the Supreme Court in *Kiefer-Stewart* and its rationale are equally applicable as a starting point in discussing the viability of *in pari delicto*.

After *Kiefer-Stewart*, the Supreme Court held that a defendant-supplier could be liable under the antitrust laws for a scheme violative thereof regardless of whether the plaintiff-retailer had participated in the scheme knowingly when he had the opportunity to extricate himself voluntarily from such involvement. *Simpson v. Union Oil Co.*, 377 U.S. 13, 16, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98, 101 (1964). *Cf. Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); *Sunshine Packers, Inc. v. American Can Co.*, 395 F.2d 86, 87–88 (5th Cir. 1968). The gist

---

1. The doctrine of "unclean hands" is also discussed hereafter in connection with plaintiffs' motion to sever the counterclaim. *See* Part V.C., *infra*.

of the holding in *Simpson* was that a restraint of trade or monopolistic practice was actionable, regardless of the participation, albeit coerced, of the plaintiff. 377 U.S. at 16–17, 84 S.Ct. at 1054–1055, 12 L.Ed.2d at 101–102. The Court emphasized in *Simpson* the public interest to be served by the institution of antitrust proceedings as legislated by the Congress. 377 U.S. at 16, 84 S.Ct. at 1054, 12 L.Ed.2d at 101 *quoting Radovich v. National Football League*, 352 U.S. 445, 453–54, 77 S.Ct. 390, 394–95, 1 L.Ed.2d 456, 462–63 (1957). Taken to its logical extent, the rationale of *Simpson* emphasizes the supervening impact of the public interest in maintaining competitive markets to such an extent as to justify subsuming and eliminating entirely the *in pari delicto* defense.[2]

### 2. The Perma Life Decision

#### a. Should In Pari Delicto Be Recognized?

Against this background, the Supreme Court decided *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982, in 1968. In that case, recognizing that a plaintiff's conduct may also be no less morally reprehensible than that of a defendant, Mr. Justice Black, speaking for the Court, ruled that the plaintiff was not to be barred from suit summarily, stating:

> "[T]he doctrine of in pari delicto, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action."

392 U.S. at 140, 88 S.Ct. at 1985, 20 L.Ed.2d at 991. The United States Court of Appeals for the Fifth Circuit characterized this quoted passage as sounding the demise of the *in pari delicto* defense in the antitrust context, *Credit Bureau Reports, Inc. v. Retail Credit Co., supra*, 476 F.2d at 995 n. 7, and the passage is sufficiently conclusive in wording to have caused several courts to decide that the defense of *in pari delicto* may no longer be invoked in an antitrust case. *See, e. g., Fairfield Cty.*

*Beverage Dist., Inc. v. Narragansett Brewing Co.*, 378 F.Supp. 376 (D.Conn.1974); *American Motor Inns v. Holiday Inns, Inc.*, 365 F.Supp. 1073 (D.N.J.1973); *Credit Bureau Reports, Inc. v. Retail Credit Co., supra*, 358 F.Supp. 780.

#### b. Breadth of the Perma Life Decision; Concurring Opinions

However, the continuing vitality of *in pari delicto* as an antitrust defense cannot be resolved based solely on the above-quoted phrase, 392 U.S. at 140, 88 S.Ct. at 1985, 20 L.Ed.2d at 990, because there is a second passage from *Perma Life* which must be interpreted and applied. After making the unequivocal statement of the law quoted above, 392 U.S. at 140, 88 S.Ct. at 1985, 20 L.Ed.2d at 990, Mr. Justice Black proceeded to state the following for the Court:

> "Respondents, however, seek to support the judgment below on a considerably narrower ground. They picture petitioners as actively supporting the entire restrictive program as such, participating in its formulation and encouraging its continuation. We need not decide, however, whether such truly complete involvement and participation in a monopolistic scheme could ever be a basis, *wholly apart from the idea of in pari delicto*, for barring a plaintiff's cause of action, for in the present case the factual picture respondents attempt to paint is utterly refuted by the record." (Emphasis added)

*Id.*

The proper scope within which this segment of the majority opinion is to be viewed drew considerable attention in separate opinions of individual justices, *see Perma Life Mufflers, Inc. v. International Parts Corp., supra*, 392 U.S. at 143–46, 88 S.Ct. at 1986–88, 20 L.Ed.2d 992–95 (White, J., concurring); at 147–48, 88 S.Ct. at 1986–1988, 20 L.Ed.2d at 995–96 (Fortas, J., concurring in the result); at 149, 88 S.Ct. at

---

2. The concept of *in pari delicto* and its applicability in an antitrust context was discussed extensively by the courts and commentators before 1968. *See, e. g.*, Comment, *In Pari Delicto and Consent as Defenses in Private Antitrust Suits*, 78 Harv.L.Rev. 1241 (1965); Bushby, *The Unknown Quantity in Private Antitrust Suits—The Defense of In Pari Delicto*, 42 Va.L. Rev. 785 (1955).

1989, 20 L.Ed.2d at 996 (Marshall, J., concurring in the result); at 153–54 & n. 1, 88 S.Ct. at 1991–92, 20 L.Ed.2d at 998–99 (Harlan, J., concurring in part and dissenting in part).

### (1)  View of Justice White

Justice White in concurring expressed his agreement with the conclusion of the majority opinion authored by Mr. Justice Black that the *in pari delicto* defense was not a useful concept and that proper antitrust analysis was more readily achieved by permitting recovery to private antitrust plaintiffs injured by conduct violative of the Sherman Act.  392 U.S. at 143, 88 S.Ct. at 1986, 20 L.Ed.2d at 992.  Justice White's primary concern was over the blanket application of a common law doctrine evolved in a different context to many and varied types of conduct of injured antitrust plaintiffs, and he illustrated this concern by using hypothetical situations to demonstrate these different types of conduct.  Justice White proceeded to state his conclusion that under some circumstances a plaintiff should be denied recovery because of his conduct within the same scheme in which defendant was allegedly involved and over which plaintiff had brought suit.  However, as Justice White emphasized, 392 U.S. at 146, 88 S.Ct. at 1988, 20 L.Ed.2d at 994, he would shift the focus of the inquiry away from a separate defense and apply the rule so as to focus particularly on the issue of causation. *Id.*

### (2)  View of Justice Fortas

Justice Fortas in concurring agreed with Justice White that the plaintiff's involvement in the scheme for participation in which defendant was alleged to have violated the antitrust laws was a prerequisite. However, he concluded that limited maintenance of the doctrine was appropriate where "the 'delictum' is approximately 'par' "—i. e., where the parties were reasonably within the same scale in the scheme, such as co-adventurers or partners.  392 U.S. at 147–48, 88 S.Ct. at 1988–89, 20 L.Ed.2d at 995.

### (3)  View of Justice Marshall

Justice Marshall, concurring in the result, agreed that mechanical application of the common law doctrine of *in pari delicto* was not appropriate in an antitrust context, but he opposed the adoption of a broad prophylactic rule completely eliminating application of the rationale underlying the doctrine.  Rather, Justice Marshall favored a limited application of the basic principle such that recovery would be denied to a plaintiff where the defendant could show that plaintiff was an active participant in the formation and implementation of an illegal scheme and was substantially equally at fault.  392 U.S. at 149, 88 S.Ct. at 1989, 20 L.Ed.2d at 996.

Expanding upon this theme, which superficially resembled the view of Justice Fortas, Justice Marshall indicated that unequal financial size between antitrust violator and antitrust victim, of the type found to be significant in *Simpson v. Union Oil Co., supra*, 377 U.S. 13, 84 S.Ct. 105, 12 L.Ed.2d 98, would not automatically defeat a defendant's claim of equal fault.  Rather, according to Justice Marshall, a plaintiff should be denied recovery where it could be demonstrated that contract provisions violative of the antitrust laws were inserted in the agreement between plaintiff and defendant at the behest and for the benefit of plaintiff as an actual participant in the formulation of the entire agreement.  392 U.S. at 149–50, 88 S.Ct. at 1989–90, 20 L.Ed.2d at 996–97.

### (4)  View of Justice Harlan

Justice Harlan, concurring in part and dissenting in part, essentially restated the underlying concept of the *in pari delicto* doctrine—i. e., that a plaintiff *in pari delicto* is one who has himself violated the law in cooperation with the defendant.  392 U.S. at 153, 88 S.Ct. at 1991, 20 L.Ed.2d at 998.  He stated his conclusion that such a plaintiff should be denied recovery where it could otherwise be shown under the Sherman Act that for participation in the underlying scheme, both the plaintiff and the defendant would be liable equally to crimi-

nal prosecution. Justice Harlan proceeded to distinguish the situation presented by conduct *in pari delicto* with the factual situations presented in a consent case; the *Kiefer-Stewart* ("unclean hands") case; and the *Simpson* ("coercion") case, and concluded that it was not possible to resolve the legal questions presented in *Perma Life* because of the lower courts' interpretation of the facts and the confused manner in which they had applied arguably distinct legal concepts so as to blur such distinctions and cause overlapping application of their principles.

### 3. State of the Law After Perma Life

#### a. Early Decisions

*Perma Life* created considerable consternation among lower federal courts struggling to determine what, if anything, remained of the defense of *in pari delicto* after that ruling. *See, e. g., Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp.*, 58 F.R.D. 357, 359–60 (S.D.N.Y.1973) (and cases cited therein). Indeed, as noted by the instant defendant, several decisions by courts of appeals interpreting *Perma Life*, e. g., *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 15–16 (4th Cir. 1971); *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 784 (6th Cir. 1970), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971); *Premier Elec. Const. Co. v. Miller-Davis Co.*, 422 F.2d 1132, 1138 (7th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970), arguably stand for the proposition that the defense of *in pari delicto* has not been totally abrogated by the *Perma Life* decision but continues to retain vitality.

#### b. Fifth Circuit Interpretation of Perma Life

The Fifth Circuit has evaluated the impact of *Perma Life* in three recent cases, two of which arose in an antitrust context and one in a securities context. In *Woolf v. S. D. Cohn & Co.*, 521 F.2d 225 (5th Cir. 1975), *petition for cert. filed*, 44 U.S.L.W. 3442–43 (January 8, 1976), a securities case, the Court of Appeals recognized that no

pronouncement had yet been made by the Supreme Court as to the propriety of the *in pari delicto* defense in the securities context. The court nevertheless held the defense to be inapplicable on the facts of *Woolf*, distinguishing *James v. DuBreuil*, 500 F.2d 155 (5th Cir. 1974); and *Kuehnert v. Texstar Corp.*, 412 F.2d 700 (5th Cir. 1969), and analogized the rationale of its decision to the language used by Justice Black in *Perma Life* (in the first quoted phrase above, Part IV.C.2.a., 392 U.S. at 140, 88 S.Ct. at 1985, 20 L.Ed.2d at 990), which stated flatly that the doctrine of *in pari delicto* was not to be recognized as a defense to an antitrust action. 521 F.2d at 227.

In *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir. 1975), *petition for cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976), the Court of Appeals considered *in pari delicto* in an antitrust context. The court began by quoting language from the *Perma Life* decision quoted above. *See* 517 F.2d at 646. The Fifth Circuit interpreted the *Perma Life* majority and concurring opinions as preventing invocation of the defense "when the defendant thrust(s) the antitrust violation upon the plaintiff". *Id.* The Court of Appeals went on to state:

"We have no occasion here to consider to what extent the 'in pari delicto' doctrine will continue to function in private antitrust litigation, if indeed the plaintiff is equally responsible, or a co-adventurer. Here the plaintiff is representative of the small businessman who acquiesces in or is coerced into a program or pattern of conduct violative of the antitrust laws because of the disproportionate bargaining power of the corporation from which he obtains most of his stock in trade. The record suggests that Green was obliged to service a growing number of accounts redesignated by General Foods as MFSA's over the years of his distributorship at a modest 'delivery charge' that would not cover his overhead and that necessitated his charging higher prices to his ordinary customers. Even if we ac-

cept General Foods' argument that *in pari delicto* and closely related equitable defenses such as consent and unclean hands are still viable after *Perma Life—an argument we seriously question*—the record shows a great disparity between the plaintiff and the defendant both in terms of responsibility for establishing the system alleged to violate the antitrust laws and the benefits conferred by that system. In these respects, the facts before us bear a significant resemblance to the facts in *Simpson v. Union Oil Co.*, 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98(.)" (Emphasis added)

517 F.2d at 646–47.

Finally, there is *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690 (5th Cir. 1975), *petition for cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976), a case very similar factually to the instant case to the extent that Kestenbaum (plaintiff), a wholesale distributor, attacked the pricing promotions of Falstaff as anti-competitive. 514 F.2d at 695. Kestenbaum there contended that the *Perma Life* decision supported the rule that he could recover fully all costs incurred in price-fixing promotions regardless of whether he was compelled to participate, or participated voluntarily.

The Fifth Circuit rejected this contention, 514 F.2d at 695, holding that under the *Perma Life* doctrine, the by-products of a restriction inuring to a plaintiff's benefit can be considered in computing damages. *Id.* The appellate panel proceeded to cite approvingly, in footnote 4 on the same page, the *Premier Electrical* and *Columbia Nitrogen* cases cited by defendant here. Part IV.C.3.a. Evaluating these post-*Perma Life* decisions, the panel concluded that *Perma Life* does not exclude completely the element of voluntariness as a defense to an antitrust claim. 514 F.2d at 695 n. 4.[3]

### 4. The Law Applicable to this Case

#### a. Introduction

The Court has carefully reviewed the law as declared by the Supreme Court in *Kiefer-Stewart, Kelly, Klor's, Simpson* and *Perma Life,* and by the Fifth Circuit in *Woolf, Greene* and *Kestenbaum,* and as analyzed thoroughly by such district courts as those deciding the *Credit Bureau* and *Skouras Theatres* cases. On the basis of this law, the Court concludes that the defenses of "unclean hands" and *in pari delicto* are no longer properly invoked in an antitrust suit for money damages.

#### b. Public Policy and the Antitrust Law

The strong public policies underlying the enactment of the antitrust laws and the public interest to be protected by their vigorous enforcement through private suits demark the guidelines within which antitrust procedure is to be established. For example, the important public concern in combatting an antitrust violation in the courts is the damage that such a violation wreaks upon the competitive market system. Private enforcement is thus premised, in the first instance, on a theory of protecting the desired market status and thereby vindicating the public interest. The equitable defenses of "unclean hands" and *in pari delicto* are plainly contrary to this statutory philosophy.

The Supreme Court made clear in *Kiefer-Stewart* that a private plaintiff's antitrust wrongs do not defeat his cause of action or immunize the defendant from money liability. As Mr. Justice White emphasized in *Perma Life*, 392 U.S. at 146, 88 S.Ct. at 1988, 20 L.Ed.2d at 994, to the extent that the concept of "equal fault" refers broadly to many types of conduct including being equally guilty of antitrust violations, such a concept is also unworkable in an antitrust context. What remains for proper consid-

**3.** Defendant urged to this Court in chambers that the *Kestenbaum* case sets out the applicable standard to be used in determining what are "jury facts" and the proper manner of their presentation. Especially considering the close similarity of factual allegations raised in part by *Kestenbaum* and the instant plaintiffs, the Court preliminarily agrees with defendant at this stage that *Kestenbaum* will be a valuable guide to establishing a format for the trial of this case, as will be *Terrell v. Household Goods Carriers Bureau*, 494 F.2d 16 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974).

eration is a plaintiff's conduct when he has become completely involved voluntarily and participated in the monopolistic scheme in which defendant also participates. *Perma Life, supra,* 392 U.S. at 140, 146, 88 S.Ct. at 1985, 1988, 20 L.Ed.2d at 990, 994; *Kestenbaum v. Falstaff Brewing Corp., supra,* 514 F.2d 690. Such participation is a "defense" to the extent that defendant can raise the issue of a plaintiff's participatory conduct. But even this evidence will not act automatically to bar recovery.

### c. Framework and Manner Within Which to Evaluate an Antitrust Plaintiff's Conduct

■ *In pari delicto* therefore does not survive as an absolute defense in an antitrust case. *Greene v. General Foods Corp., supra,* 517 F.2d at 646–47. Rather, the proper view as this Court views the matter is that evidence introduced by defendant of such conduct, if any, by a plaintiff which heretofore was labeled as *"in pari delicto"* now is appropriate when it provides rebuttal to that plaintiff's allegations of causation of injury by defendant and resulting damages therefrom. Thus, the additional baggage of a common law defense can be discarded entirely in favor of a strict application for evidentiary purposes of the framework described in such cases as *Terrell v. Household Goods Carriers Bureau, supra.* Accord, *Dobbins v. Kawasaki Motors Corp., U.S.A.,* 362 F.Supp. 54, 64 (D.Or. 1973); cf. *General Bev. Sales Co. v. East Side Winery,* 396 F.Supp. 590, 592–93 (E.D. Wis.1975). Put another way, "voluntariness" of a plaintiff's conduct thus takes on different dimensions in different contexts.

In the first context *Greene v. General Foods* teaches (as did *Simpson v. Union Oil* before it) that a "voluntary" participant in an illegal scheme is not deprived of bringing his antitrust claim by virtue of his voluntary participation—he may still allege and attempt to prove causation of injury by an economically stronger defendant and damage caused therefrom. Similarly, under *Kiefer-Stewart,* cf. *Bernstein v. Universal Pictures, Inc., supra,* 517 F.2d 976, a plaintiff who is equally as large economically as

a defendant and who "voluntarily" participates in a scheme similar to the one employed by defendant but not in defendant's scheme itself is not precluded from bringing a suit for damages and from recovering monetarily from that defendant if it can be demonstrated that the defendant, by its conduct, caused the plaintiff to suffer economic injury and damages. *See Kiefer-Stewart, supra;* cf. *Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc.,* 527 F.2d 417 (5th Cir. 1976).

■ Where the antitrust plaintiff begins to approach the economic size of the defendant in suit, and the plaintiff is a participant in the defendant's scheme, the inquiry becomes more refined but is nevertheless still to be made within the *Terrell* evidentiary framework. As Justices White and Fortas recognized in *Perma Life,* 392 U.S. at 146, 149, 88 S.Ct. at 1988, 1989, 20 L.Ed.2d at 994, 996, and as the Fifth Circuit acknowledged in *Kestenbaum,* 514 F.2d at 695, and *Greene,* 517 F.2d at 646–47, the greater the plaintiff's involvement in such a joint scheme, the less likely he is able to demonstrate by a preponderance of the evidence that the defendant caused injury to him compensable in money damages. The plaintiff who promulgates the scheme complained of has a most difficult evidentiary burden to bear. But under current law, he must still be given the opportunity to meet that burden free of any absolute defense because of the important and ultimately overriding significance of the public interest to be served by vigorous enforcement of the antitrust laws.

### 5. Impact of Applying Current Law to this Case

### a. Facts Presented at the Hearing on Preliminary Injunction

In this protracted litigation, the Court has had the benefit of hearing testimony as to the factual framework of plaintiffs' and defendant's claims in the context of plaintiffs' motion for a preliminary injunction. *See Pearl Brewing Co. v. Anheuser-Busch, Inc.,* 339 F.Supp. 945 (S.D.Tex.1972). That memorandum opinion and order expressed

the Court's conclusion, after hearing testimony for one week, that plaintiffs were not entitled to a preliminary injunction. Although they had demonstrated a likelihood of prevailing on the merits, 339 F.Supp. at 959, the plaintiffs had failed to make the requisite showing of irreparable injury required by Fed.R.Civ.P. 65. *Id.* at 959–60.

### b. Character of the Instant Defendant's Conduct

■ In the course of reaching this conclusion, the Court set out defendant's allegations in opposition to the motion, *Id.* at 949, including the vigorous contention that only defendant's "unilateral" conduct should be considered in evaluating the merits of preliminary injunctive relief. *Id.* As the Court's recitation there and the subsequent pleadings demonstrate, this suit is really about defendant's alleged maintenance of one pricing scheme, complained of by plaintiffs in their suit for monetary and injunctive relief; and plaintiffs' alleged maintenance of a different, though parallel, pricing scheme, complained of by defendant in its counterclaim for conditional injunctive relief. In other words, plaintiffs are not alleged to be involved with defendant in promulgating and enforcing jointly the same pricing scheme. On such facts, therefore, even to the extent that *in pari delicto* may still survive after *Perma Life* and its progeny, the invocation of such a defense in this case in its present posture is improper under the law.

### D. Conclusion

■ Thus, applying the applicable law to the facts of this case, the Court concludes at this time that plaintiffs' motion to strike, cognizable by the Court even at this relatively late stage of the proceeding *see United States v. 416.81 Acres of Land,* 7 Cir., 514 F.2d 627, 630 n.3; 5 Wright & Miller, Federal Practice and Procedure: Civil § 1381 (1976 Supp.), must be, and hereby is, granted as to the defenses of "unclean

hands", *cf. Forstmann Woolen Co. v. Murray Sices Corp.,* 10 F.R.D. 367 (S.D.N.Y. 1950), and *in pari delicto, cf. Fairfield Cty. Beverage Dist., Inc. v. Narragansett Brewing Co., supra,* 378 F.Supp. 376.

## V. SEPARATE TRIAL OF DEFENDANT'S COUNTERCLAIM

### A. Introduction

■ Plaintiffs' Motion to Sever Defendant's Counterclaim for Separate Trial, which the Court will construe as a motion for separate trials[4] pursuant to Fed.R. Civ.P. 42(b), is granted. Much that has already been said regarding the abrogation of the defense of "unclean hands" by the Supreme Court in the *Kiefer-Stewart* case is applicable here. That is, the Supreme Court has emphasized that the cause of action of an antitrust plaintiff cannot be defeated solely because he is alleged to have conducted independently a scheme violative of the antitrust laws. The rationale of such a prophylactic rule has significance in the context of the presentation by the instant plaintiffs of their case-in-chief.

### B. Nature of Defendant's Counterclaim

Defendant's counterclaim focuses upon activities of plaintiff Pearl Beer and other plaintiffs in pricing and/or promoting various brands of beer. Defendant thus contends that its counterclaim alleges parallel antitrust violations by plaintiffs, whether singly or in concert, of a caliber identical to that charged against defendant. Indeed, defendant contends that much of the testimony which it raises by its counterclaim must inevitably be brought out during the presentation of defenses to plaintiffs' case-in-chief. It therefore asserts that little time will be added to the overall length of trial by coupling presentation of plaintiffs' and defendant's cases.

Defendant seeks to press its counterclaim conditionally, i. e., only if plaintiffs prevail on their case-in-chief before the jury. Also,

---

**4.** As Professors Wright and Miller emphasize, a Rule 42(b) motion for "separate trials" presents considerations distinct from a Rule 21 motion for "severance" and the terms "separate trials" and "severance" should not be used interchangeably. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2387, at 277 (1971).

defendant seeks only injunctive and declaratory relief, not money damages. Thus, the underlying premise of defendant's urging of simultaneous trial of its counterclaim in this manner seems to be that any Sherman Act wrongdoing by the plaintiffs should be proscribed, but only if Sherman Act wrongdoing by defendant is first detected and penalized by a jury award of money damages.

### C. Counterclaim v. "Unclean Hands"

On the present record, the Court is unable to determine whether, and the extent to which, the same evidence would be presented by defendant for its counterclaim as for the plaintiffs' case-in-chief. Even accepting the premise of total dependency *arguendo*, the Court concludes that plaintiffs have demonstrated sufficient grounds to merit consecutive rather than concurrent presentation of the two cases. Simultaneous presentation of the claim and the counterclaim in this case could well confuse the jury into basing a decision, at least in part, upon the allegedly "unclean hands" of plaintiffs, in acting within the appropriate market, when the proper inquiry as to plaintiffs' entitlement to recovery should be

whether the defendant has engaged in any activity violative of the Sherman Act so as to have caused injury and measurable damages to any or all of the plaintiffs. *Terrell v. Household Goods Carriers' Bureau, supra.* Such fundamental confusion would be doubly costly, since defendant concedes its willingness to condition the fate of its own affirmative claims of plaintiffs' Sherman Act violations on the prior decision by the jury as to allegations of its purported anticompetitive conduct.[5]

### D. Conclusion

Not only to avoid confusion but also to preserve a logical presentation, defendant's case should be queued behind plaintiffs' case and not superimposed upon it. Since defendant seeks only equitable relief, the case may well be triable only to the Court sitting without a jury. *Cf. Heyman v. Kline*, 456 F.2d 123, 130 (2d Cir. 1972). Duplication of testimony may be avoidable in a second trial phase through utilization in transcribed form of pertinent testimony brought out in the case-in-chief. Thus, in the exercise of its discretion, 9 Wright & Miller, *supra*, § 2388 at 279, the Court concludes that separate trials are re-

5. At a second in-chambers conference, the Court asked counsel for both sides to suggest a proper trial format so as to avoid confusing the jury with the introduction of evidence by defendant under the guise of rebuttal which was actually evidence of purportedly "unclean hands" conduct of the plaintiffs. The Court was concerned that despite the striking of affirmative defenses and a separation of trials to avoid prejudice and confusion, defendant would still be able to introduce evidence of "unclean hands" and *in pari delicto* during plaintiffs' case-in-chief.

Neither side was able to suggest a suitable method for segregating the presentation of such potentially confusing testimony. Defendant contended that the proof in this case would require application of a "rule of reason" to its conduct to determine whether it had violated the antitrust laws, necessitating in its view the introduction of evidence as to plaintiffs' conduct in promulgating parallel pricing schemes to present the proper economic background so that the jury could ascertain the "reasonableness" of defendant's conduct. Plaintiffs pointed out that one of the primary components of their case would be proof of the fact of damages suffered by them allegedly as the result of

defendant's alleged anticompetitive conduct. They therefore felt that bifurcation of trial—for example, into separate stages to resolve first liability and then damages—was not workable in view of the necessary elements they had to prove to get their case to a jury.

On this basis, the Court at this time makes no effort to establish an appropriate order of presentation of proof at trial. Such a resolution undoubtedly will be necessary at a later time. As stated above in the description of the applicability of defendant's evidence to plaintiffs' case-in-chief, *see* Part IV.C.4.c., *supra*, some of the potentially confusing evidence is apparently relevant to the issue of causation of damages. The propriety of a "reasonableness" defense cannot be resolved on the present record. Also, the Court recognizes that while plaintiffs could introduce (as they indicated at the conference in-chambers) evidence to establish a prima facie case of a *per se* price fixing scheme solely out of the mouths of defendant's officers, employees and customers, as a tactical matter they might not wish to limit their presentation in this manner, but would prefer to have the jury also hear testimony from their witnesses as to the allegedly deleterious effects of defendant's alleged anticompetitive scheme.

quired here to avoid prejudice and confusion. *See Institutional Drug Distributors, Inc. v. Yankwich,* 249 F.2d 566, 569 (9th Cir. 1957); *Reines Distributors, Inc. v. Admiral Corp.,* 257 F.Supp. 619 (S.D.N.Y.1965); *cf. Value Line Fund v. Marcus,* 161 F.Supp. 533, 538 (S.D.N.Y.1968).

## VI. DISCOVERY OF EXPERT TESTI-MONY PERTAINING TO COMPUTER INFORMATION

### A. Introduction

Defendant's Motion to Compel Discovery of information pursuant to its fourth request for documents is granted in part and denied in part pursuant to Fed.R.Civ.P. 26(b)(4)(B) and 34. Defendant's motion to compel triggers a unique problem, rarely discussed by courts in an antitrust context: is the product of computer experts and economics experts working together specially to formulate a highly sophisticated and computerized econometric model discoverable under the federal rules as to the detailed structure of the computer model and alternative methods considered and rejected? On the facts available to the Court in this complex antitrust case, the Court concludes at this time that the question should be answered in the affirmative as to detailed structure and in the negative as to alternative methods.

### B. Background Facts

The evolution of the discovery controversy is best summarized as follows. In this suit alleging anticompetitive conduct among beer manufacturers, wholesalers, distributors and retailers in Texas, plaintiffs' consultants constructed an econometric model—the Texas Beer Market Model ("Model")—and programmed it on a computer for usage in testing a high volume of data to simulate market conditions in the appropriate sub-markets, the analysis of which activity ostensibly will prove relevant in this case. A separate set of computer programs known as the "Damage Assessment Program" ("DAP") was designed by the consultants to take data generated by the Model and utilize it in a series of programmed calculations to create computer output. Plaintiffs plan to take the information thus produced and make it available to Dr. Massy, plaintiffs' economics expert from Stanford University, who is scheduled to testify at trial concerning, among other matters, plaintiffs' alleged volume losses in each applicable market or sub-market.

Defendant has employed its own economics expert, a Dr. Adams from the University of Pennsylvania Wharton School of Finance. Plaintiffs to date have supplied defendant with a substantial amount of information for the use of Dr. Adams and his staff and have further agreed at a pre-trial conference to make other information available, including "intermediate" computer output. Indeed, all parties and counsel in this case have endeavored over the several years during which this case has been in a pre-trial status to exchange information freely or to attempt to resolve informally any problems arising which could otherwise hamper thorough discovery.

### C. Defendant's Requested Discovery

### 1. Computer Systems' Documentation

Defendant concedes in its motion to compel that plaintiffs have indeed made available many requested documents, including a print-out of the computer programs in the Model and DAP Systems, and have also offered to make available Dr. Massy, their "trial" expert. Defendant urges, however, that this proffered access is inadequate in this instance. Considering the nature of computer programming and computer systems design, defendant contends that access must be had to all documentation to reveal the intricate details of the computer programs in the Model and DAP Systems or else defendant will be unable to fathom fully the significance of such information as components of Dr. Massy's trial testimony. Denial of access will assertedly require defendant's computer and econometrics experts to expend needlessly many hours trying to resolve the meaning of each particular code symbol utilized in plaintiffs' computer programs.

### 2. Deposition of "Non-Trial" Computer Experts

In this same vein, defendant seeks to depose James L. Smith and Joe C. Dickson, two experts who have been employed specially by plaintiffs to develop and test the subject computer systems for this litigation, but who are not now scheduled to testify as expert witnesses at trial. As noted above, defendant concedes that plaintiffs have offered to make available for deposition "trial" expert Dr. Massy, and also does not contest plaintiffs' assertion that Dr. Massy managed and oversaw all work done by computer technologists as well as economists on calculating plaintiffs' claimed volume losses. Nevertheless, defendant contends that these two other experts must also be deposed because they allegedly performed the actual work in the computer project or developed mathematical models for generating data on price promotions and other pricing activities. They are therefore alleged to be more intimately familiar with the system than Dr. Massy (who is allegedly not a specialist in these matters), and can therefore provide necessary details not available from any other source as to work actually done on developing the computer systems and as to the details and validity of such work.

### 3. Alternative Claims

Finally, defendant seeks to discover information that it labels as "alternative claims"—i. e., alternative computer models, computer programs, input data and calculations formerly constructed by plaintiffs' experts for the purpose of computing and compiling a list of plaintiffs' alleged volume losses but purportedly rejected by plaintiffs' computer and economics expert (for whatever reason) in favor of the systems currently in use. Defendant contends that denial of access to information about these "alternative claims" will deprive it of the proper opportunity to analyze and test the validity and viability of the current Model and DAP Systems as sources of reliable evidence at trial and to prepare rebuttal and cross-examination.

### D. Plaintiffs' Opposition

#### 1. Proper Form of Discovery

Plaintiffs oppose this discovery on a variety of grounds, primarily premised upon their version of the proper scope of Fed.R. Civ.P. 26(b)(4). Initially, plaintiffs assert that defendant's motion to compel is not properly before the Court because defendant has allegedly failed to satisfy the preliminary requirements of Fed.R.Civ.P. 37— that a requesting party first inform opposing counsel of desired information and be met with a refusal to comply before moving to compel. According to plaintiffs, in its fourth request for documents defendant has sought to compel discovery of matters never before made known to plaintiffs' counsel. Plaintiffs further assert that defendant has never properly noticed the appearance of the "non-trial" experts whose depositions it now seeks to compel.

#### 2. Rule 26(b)(4)

Turning next to Rule 26(b)(4), plaintiffs assert that the rule is prophylactic in nature and must be applied restrictively in this case. Thus, according to plaintiffs, the rule permits only interrogatories to be utilized as a discovery method, unless the Court orders other means "upon substantial need being shown", because of Rule 26(b)(4)(A), thus precluding a request for documents in the form presently tendered by defendant. Further, plaintiffs assert that no showing of "need", as required by Rule 26(b)(4)(A)(ii), and no showing of "exceptional circumstances", as required by Rule 26(b)(4)(B), have been made by defendant in this case because the discovery sought by defendant does not pertain to "facts known or opinions held" by Dr. Massy or to anything other than possible impeachment evidence.

Thus, according to plaintiffs, Rule 26(b)(4)(B) operates in this case to prohibit defendant from having access to other, "non-trial", experts because Dr. Massy is available to testify as to all matters requested by defendant and upon which he will base his opinion at trial, and because

such matters fall exclusively within the ambit of his expertise.

### E. Appropriate Framework Within Which to Determine Availability of Subject Computer Information

#### 1. Fed.R.Civ.P. 34(a)(1)

Rule 34(a)(1) provides for the production or availability for inspection and copying of "data compilations from which information can be obtained, *translated, if necessary,* by the respondent through detection devices into reasonably usable form". Fed.R.Civ.P. 34(a)(1) (emphasis added). Professors Wright and Miller have characterized this language, added to Rule 34 by a 1970 amendment, as bringing the rules 'into the computer age'. 8 Wright & Miller, Federal Practice and Procedure: Civil § 2218 at 657. They further cite the Advisory Committee Note to this 1970 amendment which provides in part that a respondent to a Rule 34 discovery request may be required to use his devices to translate the data into usable form. *Id.* at 658. Courts have construed the Rule as amended to encourage an expansive reading of it, absent considerations of trade secrets, etc. *E. g., Adams v. Dan River Mills, Inc.,* 54 F.R.D. 220 (W.D.Va. 1972).

#### 2. Applicability of Rule 34 in this Case

Despite the encouragement by the courts and commentators to apply Rule 34 liberally, and the general policy applicable to discovery of computerized information set out by Rule 34, the Court cannot apply in blanket fashion Rule 34 because this case does not present the ordinary Rule 34 setting. That is, defendant does not seek here to copy a computer printout of ordinary business records or to receive computer tapes which produce such printouts in the ordinary course of business, or even to utilize plaintiffs' computer machinery for duplication or replication of regularly compiled information.

Rather, with regard to "expert" information being prepared especially for the trial of this suit, defendant here seeks: (1) the documentation of each program as to code and contents; (2) the documentation as to "alternative" program code and contents rejected for trial usage; and (3) an explanation of present and prior computer testing runs.

#### 3. Applicability or Rule 26(b)(4)(B)

As thus refined, defendant's request moves beyond Rule 34 to the very limits of Rule 26(b)(4)(B) which provides:

"A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only . . . upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."

Fed.R.Civ.P. 26(b)(4)(B). Considering the wording and intent of this rule, the Court concludes that the instant discovery controversy must be resolved solely within the boundaries of Rule 26(b)(4)(B), regardless of the fact that defendant seeks not only depositions of "non-trial" experts but also production of documents.

### F. The Scope of Rule 26(b)(4)(B)

#### 1. Interaction of Rule 37 With Rule 26(b)(4)(B)

Before determining the proper boundaries of Rule 26(b)(4)(B), the Court must dispose of preliminary matters raised by plaintiffs' opposition to the motion to compel. First, assuming *arguendo* defendant's failure to adhere to the requirements of Rule 37 and the possibility that the motion does not properly qualify for Rule 37 treatment, the Court concludes nevertheless that such a deficiency is irrelevant in view of the matters raised by the motion. The controversy raised here revolves almost entirely around the proper scope of Rule 26(b)(4)(B), and that Rule clearly contemplates the necessity to seek leave to Court in the first instance to obtain the subject discovery. Thus, the Court will treat the

motion to compel as a motion brought pursuant to Rule 26(b)(4)(B).

### 2. Interaction of Rule 26(b)(4)(A) With Rule 26(b)(4)(B); Proper Test Under Rule 26(b)(4)(B)

■ Second, Rule 26(b)(4)(B) does not limit available methods of discovery only to interrogatories in the first instance because of the alleged prophylactic character of Rule 26(b)(4) generally and the purported restrictions of Rule 26(b)(4)(A) specifically. Rule 26(b)(4) does restrict discovery because of the requirement that it imposes generally to procure leave of Court, contrary to the liberal spirit which otherwise characterizes Rules 26–37 as providing for non-judicially-supervised discovery. But the rule is designed to deal with two different situations: discovery of information from "trial" experts on the one hand, and from "non-trial experts" on the other. While the information from these two kinds of experts may be related or overlap, the two rules pertaining to their discovery—Rule 26(b)(4)(A) and Rule 26(b)(4)(B)—do not. It is therefore inappropriate to preclude discovery under Rule 26(b)(4)(B) except by interrogatories solely because this restriction arguably exists under Rule 26(b)(4)(A).

■ Proper means of discovery under Rule 26(b)(4)(B) will depend entirely upon whether, if exceptional circumstances can be shown, the exceptional circumstances require discovery by, for example, deposition or production of documents, rather than by written interrogatories. It is therefore also inappropriate, considering the mutually exclusive wording of both of these rules as to their coverage and scope, to extrapolate any "(4)(A)" test—such as "substantial need" *Wilson v. Resnick*, 51 F.R.D. 510, 511–12 (E.D.Pa.1970)—onto "(4)(B)". A distinction

which illustrates the mutually exclusive applicability of (4)(A) and (4)(B) is the discretion that the Court has under (4)(A), absent under (4)(B), regarding whether to award expenses and fees.

### 3. Background and Interpretation of Rule 26(b)(4)(B)

#### a. Introduction

■ Rule 26(b)(4)(B) was adopted in 1970, 48 F.R.D. 457 (1970), to abolish the notion that an expert's information was protected either as "privileged" or as "work product" and to insert in their place a rule of application based on the doctrine of "unfairness". Advisory Committee's Note, Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 505 (1970).[6] Of the few reported cases which have interpreted this rule since then, no case cited by the parties or considered by the Court through independent investigation discusses either "non-trial" experts' discovery in an antitrust contest or computer technology discovery of the type sought here. *Cf. United States v. Liebert*, 519 F.2d 542, 547 (3rd Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 47 L.Ed.2d 301 (1975) ("Liebert"); *United States v. Dioguardi*, 428 F.2d 1033, 1038 (2d Cir. 1970) ("Dioguardi"); *United States v. Kelly*, 420 F.2d 26, 29 (2d Cir. 1970) ("Kelly").

The law prior to 1970 fails to address the precise questions raised herein. Likewise no court makes an effort to define "exceptional circumstances" with any degree of certainty, most likely reflecting the expectation that courts would resolve these discovery controversies on a case-by-case basis. Therefore, to resolve the controversy presented here, the Court must evaluate the reasons for the Rule, the background to the Rule, the competing equitable and legal considerations which favor or detract from

---

**6.** The Advisory Committee noted the various problems attendant to the use of an adverse party's expert information in its notes to the Proposed Rule 26(b)(4)(B). *See* 43 F.R.D 211, 234–35 (1967). The Advisory Committee emphasized the danger of prohibiting discovery of information held by expert witnesses which could undercut effective cross-examination

where the particular approach that an adversary's expert can utilize cannot properly be anticipated or documented, while at the same time recognizing that in solving the problem, the Court should be requiring a party to prepare his own case in advance, and not out of the mouth of the adversary's expert. 43 F.R.D. at 235.

permitting discovery and the application of these criteria and concepts to the particular facts of this case.

### b. "Unfairness" Doctrine

The "unfairness" doctrine now embodied in Rule 26(b)(4)(B) had its genesis in two district court cases. *Boynton v. R. J. Reynolds Tobacco Co.,* 36 F.Supp. 593 (D.Mass. 1941); *Lewis v. United Air Lines Transport Corp.,* 32 F.Supp. 21 (W.D.Pa.1940). The doctrine established by these cases and refined or interpreted by subsequent commentary, *e. g.,* 4 J. Moore, Federal Practice ¶ 26.66[4] at 26–483 (1975); Long, *Discovery and Experts Under the Federal Rules of Civil Procedure,* 38 F.R.D. 111 (1965) ("Long"), emphasizes that financial factors are to be considered before one party is permitted access to an adversary's expert to "extract" his expertise without having to underwrite the initial costs or long-range expense of retaining and consulting with that expert.

The basic premise of the doctrine therefore is that permitting discovery of experts is unfair inasmuch as it is the equivalent of taking another's property without proper compensation. *Walsh v. Reynolds Metals Co.,* 15 F.R.D. 376 (D.N.J.1954). There is the additional danger, beyond any consideration of proper compensation, that such discovery would afford the opportunity to take unwarranted advantage of an adversary's trial preparation. *Smith v. Hobart Mfg. Co.,* 188 F.Supp. 135 (E.D.Pa.1960); *Long, supra,* 38 F.R.D. at 132–33.

### c. Fairness and Exceptional Circumstances in This Case

The granting of some of defendant's discovery requests, when viewed in their proper posture, would not be unfair to plaintiffs. Defendant does not seek in this case to avoid the expense of compensating expert witnesses or to develop its own case entirely out of the mouth of its adversary's expert witness. Rather, what defendant does seek here is to discover the mechanical methods, tests, procedures, assumptions and comparisons which will support the conclu-

sions of Dr. Massy, the trial expert. *Cf. Long, supra,* 38 F.R.D. at 138. Dr. Massy, who purportedly will be testifying at trial about such topics as the dynamics of the Texas beer market and the impact of promotional pricing on that market, has expertise in economics but not, so far as the Court is aware, in computer technology or computer programming. Rather, as overseer of the Model and DAP Systems, Dr. Massy comprehends the basic structure of these systems but not their interstitial functioning which utilized his design and his beginning econometrics information in such a manner as to produce the results requested after "expert" computer manipulation by the two non-trial experts, Mr. Smith and Mr. Dickson. On the present record, only these two men appear to be adequately conversant in technical information to explain this computer operation.

In this case the work of these two experts translates into a mechanical extension of Dr. Massy's primary design to its logical conclusion. Defendant contends, and plaintiffs do not seriously dispute, that its own expert, Dr. Adams, cannot properly understand, except at the expense of an inordinate amount of time, money and resources, the Model and DAP Systems because of the use by plaintiffs' non-trial experts of several otherwise undefined short-hand codes or symbols in the computer programs comprising the systems. Such an expenditure might delay the conclusion of discovery in this already protracted case.

Plaintiffs have made available voluntarily a print-out of the computer programs in the Systems and have promised to make available intermediate computer output. The corollary of defendant's need to have such a print-out and such output for proper cross-examination is defendant's need to understand fully this information before being able to commence proper analysis and subsequent preparation for thorough cross-examination. Only plaintiffs' non-trial experts know what is represented by each coded symbol and line of the programs.

These circumstances in their totality qualify as "exceptional" under Rule

26(b)(4)(B), and defendant's first two requests should be, and hereby are, granted: defendant shall at its expense receive, or be permitted to inspect and copy, the entire system documentation for the present Model and DAP Systems; after examining these systems defendant shall be afforded at its expense the opportunity to depose Mr. Smith and Mr. Dickson. Counsel should

7. The Court notes that this result as to defendant's first two requests is not only permissible on these facts under Rule 26(b)(4)(B) but is also totally in accord with the policy established by Rule 34 as stated above, see 8 Wright & Miller, *supra* § 2218. Such a result also comports with the policy suggested by the panelists for the trial of complex civil cases such as this one. *See* Manual for Complex Litigation, 1 J. Moore, Federal Practice, Part 2, § 2.715 (2d ed. 1975).

Further, such a result is consonant with the decisions of the United States Courts of Appeals for the Second and Third Circuits in the only decisions that the Court could find which presented analogous situations: *Liebert, supra,* 519 F.2d 542; *Dioguardi, supra,* 428 F.2d 1033; and *Kelly, supra,* 420 F.2d 26. Those cases did not involve requests for discovery of computer information under Fed.R.Civ.P. 26(b)(4)(B) but were rather requests made by accused persons for the right to test the validity of computer results or scientific examinations prior to the trial of criminal cases. To that extent, the cases can be analogized to the instant situation because a court in a criminal case would be considering whether a situation presented circumstances arguably parallel to the "exceptional circumstances" required to be found in the civil context. *Cf.* Fed.R.Crim.P. 16(b).

In *Liebert,* the defendant was charged with failing to file income tax returns. The Government relied heavily upon the computer evidence from the appropriate regional Internal Revenue Service center which reflected that defendant's name was absent from the list of persons who had submitted returns for the years in question, and appeared instead on a list of persons who were designated as not having filed. Defendant sought to discover these lists and to ascertain the manner in which they had been prepared by the computer.

Although holding that the IRS offer of alternative information satisfied defendant's request and avoided the danger of an invasion of the privacy of other taxpayers (or non-taxpayers) whose names appeared on the list, the Third Circuit Court of Appeals agreed with defendant (and cited the Manual for Complex Litigation for the proposition) that he was entitled to have access to the computerized information in some form to permit proper pre-trial preparation:

endeavor in the depositions to concentrate upon those aspects of the present system which require clarification so as to minimize both the inconvenience to these non-trial experts and the overall expense to all parties concerned. The parties should continue to work jointly to arrange a mutually convenient time and acceptable manner in which to conduct this discovery.[7]

"A party seeking to impeach the reliability of computer evidence should have sufficient opportunity to ascertain by pretrial discovery whether both the machine and those who supply it with data input and information have performed their tasks accurately."

519 F.2d at 547.

The defendants in *Dioguardi* were charged with committing fraud in connection with the assets and property of a bankrupt in violation of 18 U.S.C. § 152. A government witness had testified at trial after instructing a computer to prepare figures furnished by another witness which were designated to reveal the nature of fraud in connection with the assets. 428 F.2d at 1037. The computer expert had no independent knowledge of any of the facts that he used to instruct the computer and totally relied for his facts upon the recollection of the other witness. The Government failed to produce this computer program. Commenting on this failure, the Second Circuit Court of Appeals stated:

"We fully agree that the defendants were entitled to know what operations the computer had been instructed to perform and to have the precise instruction that had been given. . . . We place the Government on the clearest possible notice . . . of the great desirability of making the program and other materials needed for cross-examination of computer witnesses, such as flowcharts used in the preparation of programs, available to the defense a reasonable time before trial."

428 F.2d at 1038 *citing United States v. Kelly, supra,* 420 F.2d 26.

*Kelly* was a narcotics case in which the Government presented an expert witness who testified at trial as to the presence of the narcotics in defendant's possession discovered by the expert through the use of a new testing device called a "neutron activation" device, which supplemented or supplanted information generated through reliance upon more conventional chemical analyses. 420 F.2d at 28. The Government had refused to disclose to defendants the design or reliance upon the new device and its results before trial. The Second Circuit Court of Appeals held that such a refusal required reversal of the convictions.

Noting that the use of a new test of this caliber to supplant prior test results is permissible, the Court of Appeals went on to make several

#### d. "Alternative Claims" Under Rule 26(b)(4)(B)

■ As for its request for information on "alternative claims", defendant has failed to demonstrate at this time the presence of exceptional circumstances required to permit discovery from the non-trial experts of such information. On the present record, it appears to the Court that the theory and rationale of the Model and DAP Systems both as they have evolved and as they are presently constituted, have been conceived primarily, if not solely, by Dr. Massy. That is, the record indicates that Mr. Smith and Mr. Dickson do not participate in these systems outside the realm within which there is interplay between the computer and the econometrics models. At the same time, the present record shows that any ideas, or "alternative" ideas, pertaining to the economic substance of the models emanate in the first instance only from Dr. Massy, as the sole expert in economics.

Thus, defendant has failed at this time to demonstrate the presence of exceptional circumstances permitting it to derive the desired information pertinent to "alternative claims" only from non-trial experts. Indeed, defendant has failed on the present record to refute plaintiffs' contention that the trial expert, whom plaintiffs are willing to make available, can supply fully the requested information on plaintiffs' theories of recovery in this area of the case.[8] Therefore, defendant should at this time pursue this method of discovery as to "alternative claims" through Dr. Massy.

#### G. Conclusion

In summary, defendant will be allowed to receive, or inspect and copy, the systems documentation pertaining to the subject computer systems, and to depose the computer experts J. L. Smith and J. C. Dickson as to the manner in which the systems were developed as regards technical matters beyond the ken of Dr. Massy. However, defendant shall not be allowed, at present, to depose these experts or receive information from them pertaining to the alleged "alternative claims". Plaintiffs deny that any information about "alternative claims" exists. At this stage, the Court is unable to determine whether such information does or does not exist. In any event, the Court approves at present defendant's attempt to discover whether such information exists only from the "trial" expert Dr. Massy. To the extent that such information is availa-

---

observations as to why such new methods had to be disclosed fully to the defendants in advance of trial:

"[I]t is important that the defense be given a chance to research the techniques and results of scientific tests taken by the government. . . . [The government] chose to bolster this already quite strong case by a concededly new and, to any trier, quite dramatic demonstration of a method of determining trace elements in a substance[.] . . . [F]airness requires that adequate notice be given the defense to check the findings and conclusions of the government's experts." 420 F.2d at 28–29.

8. The question of "alternative claims" was considered by Judge McVicar in a somewhat analogous context in the first case to formulate the "fairness" doctrine on which Rule 26(b)(4) is based, *Lewis v. United Air Lines Transport Corp., supra,* 32 F.Supp. 21, a case brought to recover for damages sustained in an aviation accident where one aspect of the controversy was the role in the accident by an airplane engine cylinder. In commenting upon the proper scope of discovery of the expert as to his findings concerning the cylinder, the court stated, 32 F.Supp. at 23:

"If it should appear, however, that [the expert] made changes in the cylinder, he should tell what those changes were; he should describe the appearance of the cylinder prior thereto and after the changes were made; furthermore, *if he made any tests of the cylinder which cannot be repeated now with the same results because of the changes he has made,* he should describe such tests and the results thereof." (Emphasis added) Discovery of Dr. Massy on "alternative claims" would be proper in this case on the *Lewis* rationale and the rationale utilized by the United States Court of Appeals for the Second Circuit in *United States v. Kelly, supra,* 420 F.2d at 29. *See* note 7, *supra.*

ble, defendant is at present afforded the opportunity to be made aware of it in detail from Dr. Massy. Any discovery pertaining to "alternative claims" and other matters properly within the expertise of Dr. Massy must be addressed to him in a manner consistent with the Federal Rules, especially Rule 26(b)(4)(A). Only if it appears that Dr. Massy is unaware of certain facts which are not otherwise available shall defendant seek additional discovery upon proper motion to the Court. All costs of presently ordered discovery are to be paid by defendant.

## VII. CONCLUSION

To summarize, the Court has ruled on the pending motions as follows: (1) Plaintiff's Motion for Leave to File Second Amended Complaint is granted in part and denied in part; (2) Defendant's Motion to Amend Counterclaim is granted, and the Clerk is directed to file the Amended Counterclaim; (3) Plaintiffs' Motion to Strike Affirmative Defenses is granted; (4) Plaintiffs' Motion to Sever Defendant's Counterclaim for Separate Trial is granted; and (5) Defendant's Motion to Compel Discovery is granted in part and denied in part.

Counsel shall continue to endeavor to resolve all discovery disputes informally and to complete discovery as promptly as possible in order to accommodate and meet the contemplated trial setting for trial of this case in January, 1977.